IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

_____

No. 11-1674

_____

FILED

**October 8, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

CHRISTOPHER WAYNE BOWLING,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Raleigh County
The Honorable John A. Hutchison, Judge
Criminal Action No. 10-F-142-H

AFFIRMED

_____

Submitted: September 10, 2013
Filed: October 8, 2013

Richard W. Weston, Esq.                    Kristen Keller, Esq.
Weston Law Office                          Raleigh County Prosecuting Attorney
Huntington, West Virginia                  Beckley, West Virginia
Counsel for the Petitioner                 Counsel for the Respondent

G. Todd Houck, Esq.
Mullens, West Virginia
Counsel for the Petitioner

The Opinion of the Court was delivered PER CURIAM.

JUSTICE WORKMAN and JUSTICE KETCHUM dissent and reserve the right to file
dissenting opinions.

SYLLABUS BY THE COURT

1. "Article III, Section 14 of the West Virginia Constitution, when read in light of our open courts provision in Article III, Section 17, provides a clear basis for finding an independent right in the public and press to attend criminal proceedings. However, there are limits on access by the public and press to a criminal trial, since in this area a long-established constitutional right to a fair trial is accorded the defendant." Syl. pt. 1, *State ex rel. Herald Mail Co. v. Hamilton*, 165 W. Va. 103, 267 S.E.2d 544 (1980).

2. "On a closure motion, the ultimate question is whether, if the pretrial hearing is left open, there is a clear likelihood that there will be irreparable damage to the defendant's right to a fair trial. Factors bearing on the issue of irreparable damage include the extent of prior hostile publicity, the probability that the issues involved at the pretrial hearing will further aggravate the adverse publicity, and whether traditional judicial techniques to insulate the jury from the consequences of such publicity will ameliorate the problem." Syl. pt. 2, *State ex rel. Herald Mail Co. v. Hamilton*, 165 W. Va. 103, 267 S.E.2d 544 (1980).

3. "A trial court's failure to remove a biased juror from a jury panel, as required by W. Va.Code § 62–3–3 (1949) (Repl.Vol.2010), does not violate a criminal defendant's right to a trial by an impartial jury if the defendant removes the juror with a

i

peremptory strike. In order to obtain a new trial for having used a peremptory strike to remove a biased juror from a jury panel, a criminal defendant must show prejudice. The holding in Syllabus point 8 of *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75 (1995), is expressly overruled." Syl. pt. 3, *State v. Sutherland*, 231 W. Va. 410, 745 S.E.2d 448 (2013).

4.      "'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syllabus point 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W.Va. 435, 452 S.E.2d 893 (1994)." Syl. pt. 2, *State v. Doonan*, 220 W. Va. 8, 640 S.E.2d 71 (2006).

5.      "'Jury instructions on possible guilty verdicts must only include those crimes for which substantial evidence has been presented upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.'" Syl. pt. 1, in part, *State v. Leonard*, 217 W. Va. 603, 619 S.E.2d 116 (2005) (quoting syl. pt. 5, *State v. Demastus*, 165 W. Va. 572, 270 S.E.2d 649 (1980).

6.      "Under the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution,* a testimonial statement is, generally, a statement that is made

ii

under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Syl. pt. 8, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006).

7.     "Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence." Syl. pt. 2, *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994).

8.      "To the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value." Syl. pt. 3, *State v. Bradshaw*, 193 W. Va. 519, 457 S.E.2d 456 (1995).

Per Curiam:

This case is before the Court on appeal by the petitioner, Christopher Bowling ("Mr. Bowling"), of the November 10, 2011, order of the Circuit Court of Raleigh County convicting Mr. Bowling of first degree murder by use of a firearm of his wife, Tresa Bowling ("Ms. Bowling"). He did not receive a recommendation of mercy. In this appeal, Mr. Bowling raises seven assignments of error related to pretrial hearing procedure, impaneling the jury, the exclusion of evidence, and witness testimony. The State asserts that no error was committed below.

After a thorough review of the record presented for consideration, the briefs, the legal authorities cited, and the arguments of Mr. Bowling and the State, we find that while the circuit court erred by admitting certain testimony as detailed herein, the errors are harmless and do not warrant reversal of this case. Therefore, we affirm Mr. Bowling's conviction.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Christopher "Chris" Wayne Bowling, shot and killed his wife, Tresa Bowling, on the evening of January 31, 2010, in Daniels, West Virginia. The couple had attended a funeral together earlier that day, and afterward they spent time drinking with friends. Sometime later, Ms. Bowling left in the couple's vehicle to pick

1

up her two children to take them home.  Mr. Bowling rode home with his friend, Phillip Jones ("Mr. Jones") at approximately 10:40 p.m., and the two men sat in Mr. Jones' vehicle in the driveway talking for approximately 20 minutes.  Mr. Jones left, and Mr. Bowling entered the home.

Mr. Bowling claimed that after entering the house, he retrieved a soda from the garage, and then he joined his wife who had been asleep on the couch.  While she was lying on the couch, he sat down on the couch with her in the area of her hip.  As he sat down, he removed the handgun he routinely kept in his back pocket, a Kel-Tec Model P-3AT.  Upon taking the gun from his pocket, he noticed that the gun's slide was out of battery.[1]  According to Mr. Bowling's version of events, while he attempted to right the slide, the gun fired unexpectedly, shooting Ms. Bowling in the head.  He avers that he did not realize he was pointing the fully loaded gun at his wife's head—located no more than a couple of feet from the muzzle of the weapon—when the gun discharged.

---

[1] Mr. Bowling's expert, Amy Driver, testified as to what it means when a gun is out of battery:

> Out of battery just means . . . [f]or a semi-automatic weapon, the gun being in battery means that its' ready to fire, and that means that the slide is fully forward, the chamber is closed.  And being out of battering is any condition where the slide is not fully forward and the chamber closed.

2

At 11:35 p.m., the Raleigh County Emergency Operations Center ("EOC") received a 911 call from the Bowling residence. The caller disconnected the phone call before speaking, prompting EOC to immediately call back. Mr. Bowling answered EOC's call and informed them that he had accidentally shot his wife. EOC instructed Mr. Bowling to place pressure on the wound with a towel to slow the bleeding. EOC also dispatched police and rescue services to the Bowlings' home. During the call, Mr. Bowling requested that the operator dispatch specific police officers he knew personally.

When police arrived at the Bowlings' home, they found Ms. Bowling alive but bleeding profusely from the head wound and suffering from labored breathing. Police witnessed no indications that Mr. Bowling had taken any actions to slow his wife's bleeding. While the police assisted Ms. Bowling and processed the scene, Mr. Bowling was handcuffed and placed in the back of one of the police cars present. At that time he was not placed under arrest. Ms. Bowling was transported via ambulance to a local hospital. Mr. Bowling's mother arrived to care for the two children.

About an hour after being dispatched to the Bowling residence, the police drove Mr. Bowling to the police station where he was questioned about the shooting. Although he was not under arrest at this point, Mr. Bowling was read his *Miranda* rights,[2]

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1965) (requiring that upon taking a person into custody, the police must inform that person that, among other things, he/she has the right to remain silent).

3

which he waived. Meanwhile, despite the doctors' efforts to save her life, Ms. Bowling died of her wound at the hospital. At no time during the questioning did Mr. Bowling inquire as to the wellbeing of his wife or the two children. After the police questioning ended in the early hours of February 1, 2010, Mr. Bowling left the police station with a friend. The police arrested Mr. Bowling on February 2, 2010, for the murder of Ms. Bowling.

Pretrial hearings were held from April 26, 2011, to April 28, 2011, to evaluate the testimony of numerous witnesses that the parties intended to introduce at trial. Trial commenced on June 21, 2011. The State called more than twenty witnesses to testify at trial. The first of the State's witnesses was Ms. Bowling's oldest child, ten-year-old M.L.,[3] who was present in the house at the time of the shooting. The child testified that on the night of the shooting, directly before the shooting occurred, she heard Mr. and Ms. Bowling talking and heard Ms. Bowling proclaim, "It's not my fault," directly before the gunshot rang out. Many of the State's other witnesses testified to previous acts of violence they had witnessed Mr. Bowling direct toward Ms. Bowling or others. The court allowed the admission of this testimony as intrinsic evidence of the crime committed.

---

[3] Consistent with this Court's practice in cases involving sensitive matters, we refer to the child using her initials.

At trial, Mr. Bowling asserted the defense that the shooting was accidental. In addition to the presentation of other defense witnesses, Mr. Bowling testified on his own behalf. At the end of the trial, the jury found Mr. Bowling guilty of first degree murder, and it did not recommend mercy. By order dated November 10, 2011, Mr. Bowling received a life sentence without the possibility of parole. He now appeals his conviction to this court.

## II.

## STANDARD OF REVIEW

On appeal, Mr. Bowling raises seven assignments of error. Because this case requires the examination and application of numerous standards of review to the assignments of error, we will discuss each of the appropriate standards in conjunction with our analysis of the individual issues below.

## III.

## ANALYSIS

As stated above, Mr. Bowling raises seven assignments of error. He challenges the pretrial *in camera* hearing procedure; the jury selection process; the circuit court's decision to exclude certain evidence of the firearm's malfunctions; and the testimony of various witnesses as testimonial hearsay, as improperly admitted pursuant to

5

W. Va. R. Evid. 404(b), and as irrelevant and prejudicial. For the reasons explained in full below, we conclude that the circuit court did not commit any reversible error.

## A. Pretrial *In Camera* Hearing

During pretrial hearings taking place between April 26, 2011, and April 28, 2011, the parties presented the testimony of numerous witnesses for the purpose of determining the admissibility of the testimony at trial. A large portion of the testimony was categorized by the parties as W. Va. R. Evid. 404(b) ("Rule 404(b)")[4] "bad character" evidence. This Court held in syllabus point 2 of *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994), that when parties wish to use Rule 404(b) evidence at trial, an *in camera* pretrial hearing must be held to evaluate the admissibility of the evidence.[5]

Mr. Bowling's first assignment of error is that the trial court failed to hold the pretrial hearings *in camera* as is required by *McGinnis*. Mr. Bowling argues that the hearings were not *in camera* because members of the press were permitted to attend. Mr. Bowling believes the press should have been excluded from the hearings. He asserts that the press coverage of the hearing may have affected the opinions of those who were ultimately selected to sit on the jury, stating the following in his brief to this Court:

---

[4] The pertinent text of Rule 404(b) is quoted *infra* Part III.F.

[5] The full text of syllabus point 2 of *McGinnis* is quoted *infra* Part III.F.

During voir dire, it was evident that every juror with the exception of three, had heard about this case, either through the newspaper, tv news or while sitting in the courtroom talking among other prospective jurors – while the parties were in the process of individual voir dire of the prospective jurors. Additionally, and prior to individual voir dire, a substantial percentage of each of the three panels had made up their minds as to Appellant's guilt.

The State rejects Mr. Bowling's position, arguing instead that members of the press have a constitutional right to be present at hearings like the pretrial hearings contested in this case. The State cites to syllabus points 1 and 2 of *State ex rel. Herald Mail Co. v. Hamilton*, 165 W. Va. 103, 267 S.E.2d 544 (1980), in support of its position, which state:

> 1. Article III, Section 14 of the West Virginia Constitution, when read in light of our open courts provision in Article III, Section 17, provides a clear basis for finding an independent right in the public and press to attend criminal proceedings. However, there are limits on access by the public and press to a criminal trial, since in this area a long-established constitutional right to a fair trial is accorded the defendant.

> 2. On a closure motion, the ultimate question is whether, if the pretrial hearing is left open, there is a clear likelihood that there will be irreparable damage to the defendant's right to a fair trial. Factors bearing on the issue of irreparable damage include the extent of prior hostile publicity, the probability that the issues involved at the pretrial hearing will further aggravate the adverse publicity, and whether traditional judicial techniques to insulate the jury from the consequences of such publicity will ameliorate the problem.

7

This Court has recognized that in the context of excluding persons from the courtroom during proceedings, a circuit court's decision is subject to review for abuse of discretion and that reversal is not warranted absent a showing of prejudice. *See State v. Omechinski*, 196 W. Va. 41, 48 & n.12, 468 S.E.2d 173, 180 & n.12 (1996); *see also* W. Va. R. Evid. 615.

Both the United States Constitution and the West Virginia Constitution confer upon defendants the right to an impartial jury. U.S. Const. amend. VI; W. Va. Const. art. III, § 14. Upon carefully reviewing Mr. Bowling's brief to this Court and his oral argument, we find that Mr. Bowling does not allege that the impaneled jury was not impartial; he argues only that jurors *may* have made up their minds about Mr. Bowling's case prior to trial as a result of the press coverage during the pretrial hearings. He has alleged no actual prejudice. Further, this Court has examined the record presented, and we cannot find any evidence of prejudice. Having failed to point to any prejudice that would constitute reversible error, we conclude reversal is not warranted on this point.

## B. Jury Selection

Mr. Bowling alleges that the circuit court committed reversible error by failing to strike two potential jurors for cause. Mr. Bowling asserts that the two potential jurors expressed bias justifying their removal from the jury panel by the court. The two jurors ultimately did not sit on the jury; peremptory strikes were used to remove them,

although the record is unclear as to whether Mr. Bowling or the State used the peremptory strikes.

The Court reviews challenges to jurors under the following standard of review:

> "In reviewing the qualifications of a jury to serve in a criminal case, we follow a three-step process. Our review is plenary as to legal questions such as the statutory qualifications for jurors; clearly erroneous as to whether the facts support the grounds relied upon for disqualification; and an abuse of discretion as to the reasonableness of the procedure employed and the ruling on disqualification by the trial court." *State v. Miller*, 197 W.Va. 588, 600–01, 476 S.E.2d 535, 547–48 (1996).

*State v. Sutherland*, 231 W.Va. 410, 745 S.E.2d 448, 450 (2013).

In our *Sutherland* decision, we held:

> A trial court's failure to remove a biased juror from a jury panel, as required by W. Va.Code § 62-3-3 (1949) (Repl.Vol.2010), does not violate a criminal defendant's right to a trial by an impartial jury if the defendant removes the juror with a peremptory strike. In order to obtain a new trial for having used a peremptory strike to remove a biased juror from a jury panel, a criminal defendant must show prejudice. The holding in Syllabus point 8 of *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75 (1995), is expressly overruled.

*Id.*, syl. pt. 3. *Sutherland* makes clear that unless a criminal defendant shows prejudice, a trial court does not commit reversible error when it fails to strike a juror for cause where a party uses a peremptory strike to eliminate the offending juror from the jury panel. In the case *sub judice*, it is unnecessary to evaluate whether the jurors with whom Mr.

9

Bowling takes issue were actually biased because they did not sit on the jury, and Mr. Bowling does not allege that he suffered any prejudice as a result of using his peremptory strikes to strike the two jurors. Nowhere in his brief does Mr. Bowling allege that the jury that heard his case was biased in any way. Mr. Bowling's counsel conceded at oral argument that application of *Sutherland*, which was decided by the Court after Mr. Bowling filed his brief, operates against his success on this issue. Therefore, we find that the circuit court did not commit reversible error by refusing to strike the two jurors for cause.

## C. Firearm Malfunction Evidence

At trial, Mr. Bowling presented the testimony of an expert witness, Amy Driver, regarding the function of Mr. Bowling's gun. The function of the gun was an essential piece of Mr. Bowling's defense—that the gun accidently and unexpectedly fired when he righted the slide—and he intended to use Ms. Driver's testimony to support that defense. Mr. Bowling's counsel explained the exact purpose of Ms. Driver's testimony to the circuit court *in camera* as follows:

> [DEFENSE COUNSEL]: . . . [W]e're not going to claim this gun went off through some miracle. We're going to claim this gun had a faulty slide. When the slide was righted, instead of having his hand on the trigger guard, as he thought he did, he had it on the trigger. And Ms. Driver will testify when that slide went back into place and was righted, the gun was ready to fire. That's our whole case. We're not going to say this gun just went off through magic, and Ms. Driver is not going to say that.
> THE COURT: Let me get this straight. You're saying that your position is, is he thought he had it on the trigger

guard, but he actually had it on the trigger, with the trigger depressed; is that correct?

[DEFENSE COUNSEL]: That's correct.

Prior to trial, the specific points of Ms. Driver's proposed testimony were evaluated. Questioning of Ms. Driver during the *in camera* session established three scenarios through which the court attempted to ascertain whether the gun would fire: (1) while the gun is out of battery, a person fully squeezes the trigger and holds it in that position, then rights the slide; (2) while the gun is out of battery, a person partially squeezes the trigger and holds it in that position, then rights the slide; and (3) while the gun is out of battery, no pressure is placed on the trigger and the slide is righted. With regard to the first two scenarios, Ms. Driver's testimony appears to be somewhat inconsistent. During a April 27, 2011, pretrial hearing, she answered in the affirmative when the State's counsel asked, "If the pistol suddenly . . . pops back 'in battery' while the person holding the pistol still has their finger on the trigger with a sufficient amount of pressure, the pistol 'will fire.'" However, when asked specifically about scenarios (1) and (2) during *in camera* questioning on June 24, 2011, Ms. Driver answered that she did not know if the gun would fire in those scenarios because she did not test the gun that way. Regarding the third scenario, she testified that the gun would not fire unless some pressure was applied to the trigger. Ms. Driver repeatedly told the court that the gun would not fire under any scenario unless pressure was applied to the trigger.

11

The court decided not to allow defense counsel to indicate that the weapon was defective in its operation with regard to whether or not it would inadvertently discharge because of a mechanical malfunction. The court said:

> Ms. Driver is not going -- and you're not going to, from the defense side, be able to argue to the jury in your opening that this weapon, because it was malfunctioning in some way, that it would discharge without someone pulling the trigger. That trigger had to have been pulled, either partially or fully, before it would discharge.
>
> At the prior proceeding, it was clear that the defendant wanted to argue that simply by slamming it back into battery, that the gun discharged. That is, in fact, not her opinion. She can't say whether or not simply slamming it back into battery would cause it to discharge without there having been some sort of action by the person holding that weapon, in pulling the trigger across its track. The trigger had to be pulled at some point.
>
> What the Court is concerned about, and what the Court desired additional testimony on, was whether or not it was Ms. Driver's opinion that that [sic] being out of battery and pushing that weapon or forcing that weapon back into battery would cause the weapon to discharge without the trigger being pulled. That is clearly not her opinion and you cannot argue that to the jury.

At trial, defense counsel attempted to question Ms. Driver on whether a malfunction in the gun, which involved springs protruding from the gun, would contribute to the gun accidently firing. In response, the court conducted another examination of Ms. Driver on July 14, 2011, *in camera*. Following questioning, the court instructed that Ms. Driver could not comment on the malfunction:

> The Court has ruled previously on the guide rod springs. The fact that the guide rod springs protruded from the front of the weapon - the testimony is clear - did not cause the

12

weapon to inadvertently discharge. It's clear, short stroke or full stroke, for the weapon to have discharged, somebody had to either pull a short stroke or pull a full stroke. So the springs don't mean anything once that gun was back in battery. . . . [T]he problem that you have is, is that Ms. Driver is pretty much required to testify in conformity with her report, with the limitation that I'm not going to let her talk about the guide rod springs.

On appeal, Mr. Bowling argues that the circuit court's decision to exclude testimony by Ms. Driver establishing that the gun did not function correctly prevented him from putting on a full and fair defense. We review a circuit court's decision to exclude evidence for an abuse of discretion:

> "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W.Va. 435, 452 S.E.2d 893 (1994).

Syl. pt. 2, *State v. Doonan*, 220 W. Va. 8, 640 S.E.2d 71 (2006); *see also State v. Browing*, 199 W. Va. 417, 423, 485 S.E.2d 1, 7 (1997) ("'It is well settled that decisions regarding the admission and exclusion of evidence are peculiarly within the province of the trial court and are not to be reversed on appeal absent an abuse of discretion. Thus, evidentiary decisions of a trial court are entitled to substantial deference.' *McDougal* [*v. McCammon*], 193 W.Va. [229,] 235, 455 S.E.2d [788,] 794, n. 5.").

13

In this case, we find no error in the circuit court's decision to exclude evidence of malfunctions within the gun. Ms. Driver's testimony during pretrial and *in camera* hearings established that the malfunctions in the gun would not have contributed to the gun firing without someone placing pressure on the trigger. Ms. Driver's testimony confirmed that the gun would not fire unless pressure had been applied to the trigger. Thus, the malfunctions in the gun were irrelevant, and introduction of the malfunctions might have confused the jury. We conclude that the circuit court did not abuse its discretion by excluding this testimony.

### D. Manslaughter Instructions

Mr. Bowling assigns as error the circuit court's decision to deny instructing the jury on manslaughter. Syllabus point 1 of *State v. Leonard*, 217 W. Va. 603, 619 S.E.2d 116 (2005), in part, establishes that "'[j]ury instructions on possible guilty verdicts must only include those crimes for which substantial evidence has been presented upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.'" (Quoting syl. pt. 5, *State v. Demastus*, 165 W. Va. 572, 270 S.E.2d 649 (1980)). In *Leonard*, we said that when reviewing a lower court's decision to give an instruction, "the giving or refusing of a particular instruction is subject to an abuse of discretion standard." 217 W. Va. at 607, 619 S.E.2d at 120.

Mr. Bowling argues on appeal that he was entitled to a voluntary manslaughter instruction. The essential element of voluntary manslaughter is intent

14

without malice. Syl. pt. 3, *State v. McGuire*, 200 W. Va. 823, 490 S.E.2d 912 (1997) ("It is intent without malice, not heat of passion, which is the distinguishing feature of voluntary manslaughter." (In part).). Mr. Bowling cannot prevail on this claim because during trial, no evidence was presented to show that Mr. Bowling intended to shoot his wife without malice. Therefore, the circuit court did not abuse its discretion by refusing to give a voluntary manslaughter instruction.

Mr. Bowling also argues that the jury should have been instructed on involuntary manslaughter. "The offense of involuntary manslaughter is committed when a person, while engaged in an unlawful act, unintentionally causes the death of another, or where a person engaged in a lawful act, unlawfully causes the death of another." Syl. pt. 7, *State v. Barker,* 128 W. Va. 744, 38 S.E.2d 346 (1946). Mr. Bowling posits that he accidently shot his wife by committing "the unlawful act of (1) firing his weapon in the home/or . . . (2) wantonly brandish[ing] his weapon in the home." Option (1) relies on W. Va. Code § 20-2-58 (1985), which is within the article of the Code regulating wildlife resources. That section states, in part "It shall be unlawful for any person to shoot or discharge any firearms across or in any public road in this state, at any time, or within four hundred feet of any schoolhouse or church, or within five hundred feet of any dwelling house . . . ." This section is clearly inapplicable to this case in that it regulates hunting and only discusses shooting *outside* of a house, not inside. Option (2) relies on W. Va. Code § 61-7-11 (1994), which reads, in part, "It shall be unlawful for any person armed with a firearm or other deadly weapon, whether licensed to carry the same or not,

15

to carry, brandish or use such weapon in a way or manner to cause, or threaten, a breach of the peace." This section is also inapplicable because it requires some level of intent; one cannot accidently brandish a gun. The petitioner's sole defense at trial was that he accidently shot his wife.

We conclude that Mr. Bowling was not entitled to an involuntary manslaughter instruction. Accordingly, the circuit court did not abuse its discretion in refusing to instruct the jury on involuntary manslaughter.

### E. Testimonial Hearsay

In his fifth assignment of error, Mr. Bowling alleges that the circuit court erred by admitting the testimony of five different witnesses: Trooper Andre Palmateer, Charles Richmond, Marilyn Smith, Beth Jones, and Gina Jarrell. Mr. Bowling alleges that certain portions of these witnesses' testimony were testimonial hearsay and that the admission of the testimony violated his constitutional right to confront his accusers pursuant to the Sixth Amendment to the United States Constitution and Article III, Section 14 of the West Virginia Constitution.

W. Va. R. Evid. 801(c) defines hearsay as follows: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The definition of

16

"testimonial statement" appears in syllabus point 8 of *State v. Mechling*, 219 W. Va. 366,

633 S.E.2d 311 (2006):

> Under the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution,* a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Mechling* illustrates the application of this syllabus point through a discussion of the U.S.

Supreme Court case *Davis v. Washington*, 547 U.S. 813 (2006):

> The Court in Davis proceeded to apply these guidelines to the facts of Davis's and Hammon's cases. As to Davis, the Court concluded that circumstances objectively indicated that the *primary purpose of the victim's statement in the 911 call was to appeal for police assistance to meet an ongoing emergency.* The victim was not "acting as a witness; she was not testifying . . . . No 'witness' goes into court to proclaim an emergency and seek help." 547 U.S. at ___, 126 S.Ct. 2266 (Slip Op. at 13). The Court therefore found that the victim's "early statements identifying Davis as her assailant . . . were not testimonial," and that the admission of the 911 call into evidence against Davis did not violate the Confrontation Clause. FN7 547 U.S. at ___, 126 S.Ct. 2266 (Slip Op. at 14). Davis's conviction was affirmed.

*Mechling*, 219 W. Va. at 377, 633 S.E.2d at 322 (emphasis added).


This Court reviews a circuit court's decision to admit or exclude evidence

for an abuse of discretion. Syl. pt. 2, *Doonan*, 220 W.Va. 8, 640 S.E.2d 71.[6] However, an

---

[6] Syllabus point 2 of *Doonan* is quoted in full *supra* Part III.C.

17

abuse of discretion is not reversible if the circuit court's error is harmless. W. Va. R. Crim. P. 52 declares that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Similarly, W. Va. R. Evid. 103(a) states that

> error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.

An error affects a petitioner's substantial rights if "the error was prejudicial. It must have *affected the outcome* of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice." Syl. pt. 9, in part, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995) (emphasis added).

When the alleged error involves the infringement of a petitioner's constitutional rights, the burden is on the State to show that the error is harmless beyond a reasonable doubt:

> We have stated that the "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syllabus Point 5, *State ex rel. Grob v. Blair,* 158 W.Va. 647, 214 S.E.2d 330 (1975). *In accord*, Syllabus Point 14, *State v. Salmons,* 203 W.Va. 561, 509 S.E.2d 842 (1998). "An error in admitting plainly relevant evidence which possibly influenced the jury [or a trial judge] adversely to a litigant cannot . . . be conceived of as harmless." *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "'Errors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable

18

possibility that the violation contributed to the conviction.'" *State v. Jenkins,* 195 W.Va. 620, 629, 466 S.E.2d 471, 480 (1995) (*quoting,* Syllabus Point 20, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974)). Moreover, once an error of constitutional dimensions is shown, the burden is upon "the beneficiary of a constitutional error"—usually the State—"to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824.

*Mechling*, 219 W.Va. at 371, 633 S.E.2d at 316. Accordingly, we must first determine whether the court abused its discretion by admitting the disputed testimony, then we must proceed to evaluating whether the testimony is harmless.

### 1. The disputed testimony

The first portion of testimony Mr. Bowling argues should have been excluded came from Trooper Andre Palmateer ("Trp. Palmateer"). Prior to Trp. Palmateer giving this testimony, the circuit court instructed the jury as follows:

> Other statements of Tresa Bowling are not made -- I'm sorry. Other statements of Tresa Bowling not made during or immediately after an event, concerning Christopher Bowling's actions, are not offered to show that he committed such acts or to prove his character. However, they may be considered by you insofar as you believe that the fact that Tresa Bowling allegedly made such statements shows a source of antagonism between her and the defendant, Christopher Bowling, and the nature of their relationship and the historical context of her death.

Trp. Palmateer, a friend of both Mr. and Ms. Bowling, testified about an encounter he had with Ms. Bowling sometime between late 2007 and early 2008. He

19

stated that he was off duty and that he spoke with Ms. Bowling in a bar. During direct examination, Trp. Palmateer was questioned by the State as follows:

> Q       I believe you had testified that it was -- you observed that Tresa had been crying; is that right?
> A       Yes.
> Q       And from your observation, did she appear upset?
> A       Yes, she was.
> Q       At any time as she was speaking to you, was she wanting you to take police action against the defendant?
> A       None.
> Q       At any time that she was speaking to you, did she want any police involvement in what she was telling you?
> A       No.
> Q       In fact, did she beg you not to tell?
> A       She did beg me not to tell.
> Q       Would you tell the jurors, did she describe -- did she describe an event that had occurred immediately before she was speaking with you?
> A       She did.
> Q       And would you tell the jurors what Tresa described to you?
> . . . .
> [A]       Tresa didn't -- she didn't want to speak to me at all about the situation, what was going on, but she later confided in me that Chris had been abusive to her and, at one point in time during this abuse, he had actually pulled his weapon out and fired a round off in the house.

Mr. Bowling's counsel timely objected to the testimony concerning abuse and firing the gun as testimonial hearsay.

We agree with Mr. Bowling that the testimony is hearsay. Ms. Bowling's statement, given through Trp. Palmateer, has no other purpose other than to prove that Mr. Bowling committed the alleged acts, despite the circuit court's limiting instruction

20

and the State's assertions to the contrary. Furthermore, we agree that Trp. Palmateer's statements are testimonial. The evidence presented at trial indicates that Ms. Bowling knew Trp. Palmateer was a police officer. Also, Ms. Bowling was not making the statement for the purpose of receiving any kind of help from him to deal with an ongoing emergency, as evidenced by her request that he not reveal to anyone the events she described for him. In *State v. Ferguson*, 216 W. Va. 420, 423, 607 S.E.2d 526, 529 (2004), we said, "[W]e do not perceive that *Crawford's* largely unexplored ban on 'testimonial hearsay' . . . extends to the statements to non-official and non-investigatorial witnesses, made prior to and apart from any governmental investigation, that are issues in this case." Unlike the witnesses in *Ferguson*, the witness in this case was a governmental official. An objective witness would reasonably believe that the statement would be available for use at a later trial, and therefore it is testimonial. Thus, the court abused its discretion by allowing Trp. Palmateer to testify as to this conversation between himself and Ms. Bowling.

The second portion of testimony Mr. Bowling believes should have been excluded came from Charles Richmond ("Mr. Richmond"). Mr. Richmond was a friend of Ms. Bowling. Over defense counsel's objection, he testified as follows on direct examination by the State:

> Q . . . In the context of [Ms. Bowling's] discussions with you concerning her marriage to the defendant, did she ask you to promise something?
> A Yes.
> . . . .

21

Q       And what did you promise on, if you know what I mean?

A       She asked me to promise her that -- I think her words were, if I'm shot in my sleep, promise me that you'll tell the police that it was no accident.

We believe Mr. Richmond's testimony is also testimonial hearsay.  As with the testimony of Trp. Palmateer, Ms. Bowling's statement through Mr. Richmond is hearsay because it is offered in evidence to prove the truth of the matter asserted.  It is testimonial because Ms. Bowling specifically requested that Mr. Richmond tell her statement to others in the event she is shot.  An objective witness would reasonably believe that the statement would be available—even intended—for use at a later trial.  The court abused its discretion by failing to exclude this testimony.

The third portion of testimony with which Mr. Bowling takes issue is that of Marilyn Smith ("Ms. Smith").  During direct examination by the State, she was questioned as follows over defense counsel's timely objection:

Q       Did she express any fears to you as to what would happen if she tried to leave?
A       Yes.
Q       What were her fears?
A       That he would kill her.
. . . .
Q       Would you tell the jurors what Tresa told you or asked you?
A       She said that if anything ever happened to her, that I would know what to tell them.

22

The statement "if anything ever happened to her, that I would know what to tell them" is testimonial hearsay for the same reason that Mr. Richmond's testimony was testimonial hearsay: It is an out-of-court statement offered in evidence to prove the truth of the matter asserted, and Ms. Bowling clearly intended the statement to be used against her husband at any trial that might someday occur. The circuit court abused its discretion by allowing Ms. Smith to give the testimony.

The fourth witness Mr. Bowling alleges provided testimonial hearsay was Beth Jones. During direct examination by the State, Beth Jones testified as to a conversation she had with Ms. Bowling two days after Ms. Bowling alleged Mr. Bowling had hit her with grilling tongs ("tong incident"):

> Q      Then when you called your sister, Tresa, at first did you know whether she was inside or outside.
> A      No. . . .
> Q      And then would you tell the jury, did she describe an injury?
> A      Yes. She had -- on Friday evening, had be cooking out and Chris [Mr. Bowling] came home, I guess, and was upset and he had taken a set of the grilling tongs and hit her in the head with them and gashed her head open.

Although defense counsel did not object to this testimony at trial, counsel did object to the admissibility of the statement when the testimony was elicited by the State at a pretrial hearing. Counsel's hearsay objection was overruled on the grounds that the testimony fell under the "excited utterance" hearsay exception in W. Va. R. Evid. 803(2).

> "'In order to qualify as an excited utterance under W. Va. R. Evid. 803(2):(1) the declarant must have experienced a [startling] event or condition; (2) *the declarant must have*

23

*reacted while under the stress or excitement of that event and not from reflection* and fabrication; and (3) the statement must relate to the startling event or condition.' Syl. pt. 7, *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995)."

Syl. pt. 10, *State v. Surbaugh*, 230 W. Va. 212, 737 S.E.2d 240, (2012) (emphasis added).

We agree with Mr. Bowling that Beth Jones' testimony is hearsay not falling under the excited utterance exception. Again, it involved an out-of-court statement offered for its truth. The conversation took place two days after the incident allegedly occurred, which is well outside of the timeframe in which Ms. Bowling's statements were the direct result of the stress or excitement.

We do not agree with Mr. Bowling's assertion that these statements are testimonial. *Ferguson* is again instructive. In that case, friends of the victim testified at trial that the victim had told the friends that the petitioner had threatened the victim with a knife. *Ferguson*, 216 W. Va. at 423, 607 S.E.2d at 529. Because the statements were made to "non-official and non-investigatorial witnesses," and because they were "made prior to and apart from any governmental investigation," the statements were not testimonial. Beth Jones' testimony is decidedly similar to the testimony in *Ferguson*, and like in *Ferguson*, it does not represent testimonial hearsay.

Beth Jones' testimony concerning the tong incident was also produced through a document created by a Women's Resource Center employee upon discussing

24

the situation with Ms. Jones. The document was admitted over defense counsel's objection. We agree that the document contains hearsay, and we are further troubled by the lack of foundation provided to support the admission of this evidence.

The final witness Mr. Bowling contends provided testimonial hearsay is Gina Jarrell ("Ms. Jarrell"). Ms. Jarrell is the psychotherapist who treated Ms. Bowling's two children after Ms. Bowling's death. Ms. Jarrell testified that the children, who were 10 and 4 years old at the time of the shooting, suffered from post-traumatic stress disorder, and she testified as to things the children had told her during their therapy sessions. Documents related to treatment were also entered into evidence.

Mr. Bowling asserts that because treatment was sought for the children after Ms. Bowling's death, the evidence is necessarily testimonial. We do not agree. The statements in this case—things the children told Ms. Jarrell—were almost certainly not made with the knowledge that the statements would or could later be used in court. Furthermore, although the statements made by the children to Ms. Jarrell are hearsay, they fall under the "medical treatment" exception to hearsay in W. Va. R. Evid. 803(4).[7]

---

[7] W. Va. R. Evid. 803(4) declares that the hearsay rule does not exclude "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

Therefore, we find no abuse of discretion on the part of the circuit court in allowing Ms. Jarrell's testimony and treatment documents into evidence.

2. *Harmless error analysis*

Having found that the circuit court abused its discretion by admitting particular testimony of Trp. Palmateer, Mr. Richmond, Ms. Smith, and Beth Jones over defense counsel's objection, we must now proceed to determine whether the court committed reversible error. We will begin by addressing the testimony of Trp. Palmateer, Mr. Richmond, and Ms. Smith, which we determined to be testimonial hearsay. As noted above, errors containing a constitutional dimension must be harmless beyond a reasonable doubt to avoid reversal.

We find that the State has met its burden with regard to Trp. Palmateer, Mr. Richmond, and Ms. Smith. At trial, the State presented ample evidence through both the witnesses named in this assignment of error and through numerous other witnesses sufficient to support the jury's finding that Mr. Bowling murdered his wife. The jury heard (1) that the Bowlings had a history of domestic conflict; (2) that Mr. Bowling had pointed his loaded gun at Ms. Bowling's head and pulled the trigger; (3) that Ms. Bowling was shot in the head; (4) that Ms. Bowling's daughter heard Mr. and Ms. Bowling speaking after he arrived home and that she heard Ms. Bowling say, "It's not my fault" directly prior to the shot; (5) that Mr. Bowling appeared to have taken no action to aid his wife after the shooting except to summon police and rescue services to his home;

26

and, among other evidence, (6) that Mr. Bowling appeared to show no concern for his children or his wife while being questioned about the shooting prior to his arrest. Although it was error for the court to repeatedly admit the improper evidence presented to it by the State,[8] had the State never presented the hearsay and testimonial statements at issue, we do not believe that the jury's verdict would have been different. We further find that the court's erroneous admission of Beth Jones' testimony, which is evaluated under a lesser standard than that of constitutional errors, is harmless error for the same reasons noted above. Therefore, we conclude that the testimonial hearsay was harmless beyond a reasonable doubt. Because the errors are harmless, they are not reversible.

### F. 404(b) Character Evidence

In this assignment of error, Mr. Bowling claims that the circuit court erred by admitting the State's "bad character" evidence and that the same should have been excluded pursuant to Rule 404(b). This rule states, in part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

---

[8] During oral argument, the State's counsel was questioned by the Court as to why she "muddied the waters" of this case by presenting evidence that was clearly inadmissible. Counsel insisted that in preparing for a trial, it is imperative that the State present all available and relevant evidence to the jury. While we agree with the position that the State's counsel must zealously pursue each of her cases, counsel's advocacy must also be tempered by the rules and case law of this Court.

Mr. Bowling specifically takes issue with "bad character" evidence presented by Trp. Palmateer, Mr. Richmond, Beth Jones, Rebecca Jones, Mary Ann Lilly, M.L., and Marita Judy.

The State argues that the disputed testimony of Trp. Palmateer, Mr. Richmond, Beth Jones, Rebecca Jones, and Mary Ann Lilly was admissible as "intrinsic" evidence.

> In determining whether the admissibility of evidence of "other bad acts" is governed by Rule 404(b), we first must determine if the evidence is "intrinsic" or "extrinsic." *See United States v. Williams,* 900 F.2d 823, 825 (5th Cir.1990): "'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." (Citations omitted). If the proffer fits into the "intrinsic" category, evidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof charged in the indictment. *See United States v. Masters,* 622 F.2d 83, 86 (4th Cir.1980) (stating evidence is admissible when it provides the context of the crime, "is necessary to a 'full presentation' of the case, or is . . . appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the "res gestae"'"). (Citations omitted).

*State v. LaRock,* 196 W. Va. 294, 312 n.29, 470 S.E.2d 613, 631 n.29 (1996). The State asserted during the pretrial hearings occurring from April 26, 2011, through April 28, 2011, that only the testimony of M.L. and Marita Judy was "extrinsic" and thus subject to extended analysis pursuant to *McGinnis,* 193 W. Va. 147, 455 S.E.2d 516. Syllabus point 2 of *McGinnis* requires that

28

[w]here an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

This Court reviews a circuit court's decision regarding Rule 404(b) according to *LaRock*:

The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

196 W. Va. at 310–11, 470 S.E.2d at 629–30. However, upon discovering error, a petitioner is only entitled to reversal if the error affected his substantial rights. W. Va. R.

29

Crim. P. 52; W. Va. R. Evid. 103(a).[9]  Accordingly, we again begin by determining

whether the court erred by admitting the disputed evidence, then we will move on to

determine whether any errors are harmless.


*1. The disputed testimony*

As noted above, the State alleges that the disputed testimony of Trp.

Palmateer, Mr. Richmond, Beth Jones, Rebecca Jones, and M.L. is admissible as *res*

*gestae* of the crime.  Mr. Bowling, on the other hand, argues that this evidence should

have been excluded pursuant to Rule 404(b) as evidence of his bad character.


We can easily decide the admissibility of Mr. Richmond's testimony.  Mr.

Richmond testified as to a promise he made to Ms. Bowling,[10] but Mr. Bowling does not

point to any other portion of Mr. Richmond's testimony that involves bad acts committed

by Mr. Bowling.  Therefore, Rule 404(b) is inapplicable to his testimony.  Whether the

court erred with regard to M.L's testimony is also easily determined.  During the pretrial

hearing on April 26, 2011, M.L. testified that she witnessed Mr. Bowling throw a plastic

cup containing a frozen margarita drink at Ms. Bowling's head ("margarita incident").

At trial, however, M.L. did not discuss the margarita incident.  Therefore, there can be no

---

[9] The relevant text of W. Va. R. Crim. P. 52 and W. Va. R. Evid. 103(a) is quoted *supra* Part III.E.

[10] Mr. Richmond's testimony is quoted *supra* Part III.E.1.

error with regard to M.L.'s pretrial statements about the margarita incident which were not presented to the jury.

The remaining witnesses did testify as to prior bad acts committed by Mr. Bowling. Trp. Palmateer testified as to Ms. Bowling's allegation, made in 2007 or 2008, that Mr. Bowling abused her and fired off a shot in her house.[11] Beth Jones, Rebecca Jones, and Mary Ann Lilly testified as to the tong incident, which allegedly occurred at the beginning of July 2009.[12] Whether these statements were admissible as *res gestae* of the shooting depends on whether the statements were intrinsic. The State cites to *State v. Dennis*, 216 W.Va. 331, 607 S.E.2d 437 (2004), in support of its proposition that the events were intrinsic. In *Dennis*, we evaluated the admissibility of testimony alleging that the appellant committed bad acts toward the victim in the months prior to the crime:

> The evidence contested by Appellant is the testimony of the victim, the victim's grandmother and two Wheeling law enforcement officers. The victim's testimony related various incidents occurring in the *three months preceding the events occurring on July 23 and 24, 2001, for which Appellant was indicted*. These incidents were used to demonstrate Appellant's pattern of abusive and controlling behavior as a means of defining the turbulent nature of the relationship the victim had with Appellant after she attempted to break off the relationship with Appellant in late April 2001. The testimony of the grandmother and law enforcement

---

[11] Trp. Palmateer's testimony is quoted *supra* Part III.E.1.

[12] Beth Jones's testimony is quoted *supra* Part III.E.1. All three women testified that Ms. Bowling had called them and told them that Mr. Bowling had hit her with a set of grilling tongs.

31

officers related the events of June 27, 2001, which bore a striking similarity to the July episode and resulted in the arrest of Appellant for violation of a domestic violence protective order. After carefully reviewing the record, we cannot say that the trial court abused its discretion in finding that the prior acts constituted intrinsic evidence, not subject to Rule 404(b) analysis. While the acts were not part of a "single criminal episode" or "necessary preliminaries" to the charged offenses, it is difficult to conclude that the evidence was not necessary "to complete the story of the crimes on trial" or otherwise provide context to the crimes charged. *Id.* This is especially true in light of the domestic violence overlay to the pattern of behavior.

216 W. Va. at 352, 607 S.E.2d at 458 (emphasis added).

The State's reliance on *Dennis* is misplaced. In deciding what constitutes intrinsic evidence, *LaRock* relies on *United States v. Masters*, 622 F.2d 83 (4th Cir. 1980), quoting small portions of the pertinent language in summarizing that opinion. *Dennis* also includes text that originally appeared in *Masters*: "to complete the story of the crime." The full quote from *Masters* indicates that evidence is only intrinsic when it

is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the 'res gestae'" or the "uncharged offense is '*so linked together in point of time and circumstances with the crime charged* that one cannot be fully shown without proving the other . . . ' [and is thus] part of the res gestae of the crime charged."

622 F.2d at 86 (footnotes and internal citations omitted) (emphasis added). Neither the abuse alleged through Trp. Palmateer's testimony, which occurred in 2007 or 2008, nor the tong incident, which occurred more than six months before the 2010 shooting, is

32

linked together in point of time and circumstances with the crime charged herein. While the Court found in *Dennis* that evidence of abuse occurring within a few months of the crime was admissible as *res gestae* under the specific facts of that case, the events occurring six months to three years prior to the shooting in this case are not. The evidence is not intrinsic, and the circuit court erred by failing to subject this evidence to the admissibility analysis required by syllabus point 2 of *McGinnis*.

Mr. Bowling also argues the circuit court erred by admitting additional testimony through Mary Ann Lilly and the testimony of Marita Judy. Mr. Bowling takes issue with Mary Ann Lilly's statements concerning the margarita incident. He also believes that the testimony of his ex-wife, Marita Judy, was improperly admitted. At trial, Ms. Judy maintained that a short time prior to the end of her marriage with Mr. Bowling, the two were involved in a fight. She stated that during the fight, Mr. Bowling punched a hole through the couple's bathroom door, and then he grabbed her in such a way as to cause her hot curling iron to rest against her face, burning her.

The State presented the testimony of Mary Ann Lilly and Ms. Judy as Rule 404(b) extrinsic evidence, and the court conducted an evaluation of the evidence pursuant to syllabus point 2 of *McGinnis*, quoted *supra*. At the April 28, 2011, pretrial hearing, the court and the State engaged in the following dialogue:

> THE COURT: So I think that one occurs. For the record, with regard to Ms. Judy's testimony, I have to make a finding, and I find that -- based upon a preponderance of the

33

evidence, I find the incident did occur and that given the proper cautionary instruction, which will be given at the time Ms. Judy testifies, and at the end of it at the time we do the charge, I'll give it at both times, and I will give the McGinnis instruction with regard to Ms. [Mary Ann] Lilly. Is that her name?

    [THE STATE]:    Yes, Your Honor.

    THE COURT:    Ok, Ms. Lilly's discussion of the cup-throwing, blender incident.

    [THE STATE]:    And, Your Honor, I take it then the Court is also making the requisite Rule 403 finding under McGinnis?

    THE COURT:    I make, under 403, that the admission of the prior bad acts' [sic] testimony, as set forth in Ms. Judy's testimony, and in Ms. Lilly's testimony, is more probative than prejudicial, and I believe it is appropriately -- it should be appropriately admitted before the jury.

    [THE STATE]:    And I may have missed it, but just for the record, I take it is the Court -- has the Court then made the finding that the evidence testified to by Ms. Lilly, as to what we refer to as the blender incident, that the Court makes the finding that event did occur and did --

    THE COURT:    Oh, yeah, I thought I made that clear.

    [THE STATE]:    You may have.

THE COURT:    That event did occur, and I make a finding by a preponderance of the evidence. As the incident with Ms. Judy, I find that by a preponderance of the evidence, that incident did occur.

We do not believe the court erred by admitting this evidence. The court conducted the analysis required by *McGinnis*. In applying our standard of review, we find no clear error in the court's factual determination that the incidents Mary Ann Lilly and Ms. Judy described did occur. At trial, the court repeatedly instructed the jury that the evidence was relevant to show the state of mind or intent of Mr. Bowling, which is an

acceptable use of Rule 404(b) evidence. Finally, we agree that the evidence is more probative than prejudicial.

*2. Harmless error analysis*

Reversal of Mr. Bowling's conviction for the errors the circuit court committed regarding the testimony of Trp. Palmateer, Beth Jones, Rebecca Jones, and Mary Ann Lilly, depends on a finding that the errors affected the substantial rights of Mr. Bowling. W. Va. R. Crim. P. 52; W. Va. R. Evid. 103(a).[13] After carefully reviewing the record and the arguments of the parties, we conclude that the errors were in fact harmless. If this evidence had been completely excluded from the trial, the State would have still provided enough evidence to support Mr. Bowling's conviction. We believe that without the evidence, the jury would have still convicted Mr. Bowling on the other strong evidence presented against him. Thus, the court's admission of the disputed 404(b) evidence is harmless error and not reversible.

## G. Testimony of Lieutenant Bare

In Mr. Bowling's final assignment of error, he posits that the circuit court erred by allowing the State to admit certain portions of Lieutenant James Bare's ("Lt. Bare") testimony at trial. We review a circuit court's decision to admit or exclude

---

[13] *See* the text of these rules and accompanying discussion *supra* Part III.E.

35

evidence for an abuse of discretion. Syl. pt. 2, *Doonan*, 220 W.Va. 8, 640 S.E.2d 71.[14]

With regard to challenges to the relevancy of evidence, we have said:

> We emphasize again that in the relevancy area a circuit court has considerable latitude in determining whether to admit or exclude evidence under Rules 401 through 403 of the Rules of Evidence. We review these rulings only for an abuse of discretion. Only rarely and in extraordinary circumstances will we, from the vista of a cold appellate record, reverse a circuit court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect. Our review, however, must have some purpose and that is why we review under the abuse of discretion standard. In general, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them.

*Gentry v. Mangum*, 195 W. Va. 512, 520 n.6, 466 S.E.2d 171, 179 n.6 (1995).

Determining whether the circuit court committed an abuse of discretion is only the first step in our analysis; we must also decide, if the court did abuse its discretion, whether the error is harmless.

*1. The disputed testimony*

At trial, Lt. Bare testified as to 911 calls made by other defendants in other cases over defense counsel's objection. Mr. Bowling challenges the following testimony by Lt. Bare on relevancy grounds:

---

[14] Syllabus point 2 of *Doonan* is quoted in full *supra* III.C.

Q      In fact, forget the hangup for a moment. Even if the defendant -- if we knew beyond a reasonable doubt that it was the defendant who called 911 to say he accidentally -- or to say that he had killed his wife or had shot is wife, from your law enforcement experience and your years as a detective, did that cause you to infer that it showed no consciousness of guilt?

A      (No response.)

Q      Do you want me to repeat that? That was a very messy question and I apologize.

A      Yes, please.

[DEFENSE COUNSEL]:  Object, Your Honor. He can't opine whether it's consciousness of guilt or not.

Q      I can rephrase that question.

THE COURT:      Rephrase the question.

Q      What was the last case in which you testified in Raleigh County Circuit Court?

A      Rodney Berry.

[DEFENSE COUNSEL]:  Objection, relevancy.

THE COURT:      I'll let her go, and she'll tie it up or I'll sustain your objection.

Q      And what was Rodney Berry -- how many people did he kill?

A      Two.

Q      And right after -- he shot and killed them; didn't he, at Bradley?

A      Yes, he did.

Q      After shooting and killing them, who did he call?

A      He called 911.

Q      And what did he tell 911?

A      That he had lost it and killed two people.

Q      And then did you also assist my office and myself in the prosecution of State v. Alfred Gray?

A      Yes, I did.

Q      What did Alfred Gray do?

A      He called 911, as well.

Q      And when he called 911, what did he say to 911?

A      That he had shot his wife or girlfriend.

Q      Excuse me, I can't hear with the noise.

A      That he had shot his significant other. I can't remember if she was wife or girlfriend.

37

Q      And Mr. Gray also claimed that was an accident; didn't he?

A      Yes.

Q      And what about Garth Lester, who is Garth Lester?

A      Garth Lester shot and killed his son.

Q      And then what did Garth Lester do after shooting and killing his son?

A      He called 911, as well.

Q      And told 911 he shot him accidentally; right?

A      Yes, he did.

We agree with Mr. Bowling's assertion that the testimony is irrelevant. What other defendants may have done when they called 911 has absolutely no bearing on what the Mr. Bowling did. The court abused its discretion by allowing the State to elicit this evidence.

Mr. Bowling also argues that the circuit court erred by allowing Lt. Bare to testify as to a legal conclusion. Lt. Bare was questioned by the State as follows:

Q      And so, by the time you obtained the warrant and up to until today, have you, as the chief investigator, found substantial evidence, beyond a reasonable doubt, that the defendant shot his wife with malice?

[DEFENSE COUNSEL]: Objection, Your Honor, calls for a legal conclusion, beyond a reasonable doubt.

THE COURT:      Overruled.

A      Yes, ma'am.

Again, we find that the circuit court has abused its discretion. W. Va. R. Evid. 704 states that "[t]estimony in the form of an opinion or inference otherwise

38

admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Lt. Bare's opinion is not "otherwise admissible"; it does not assist the trier of fact in determining a factual issue as required by W. Va. R. Evid. 701 or 702.[15] *See Jackson v. State Farm Mut. Auto. Ins. Co.*, 215 W. Va. 634, 644, 600 S.E.2d 346, 356 (2004) (finding that it was improper for the witness to testify as to the existence of malice). Whether Mr. Bowling shot his wife with malice is a legal conclusion that is entirely for the jury to decide. The court erred by allowing the State to elicit this evidence.

Regarding a third portion of Lt. Bare's testimony, Mr. Bowling argues that the court allowed Lt. Bare to impermissibly comment on Mr. Bowling's Fifth Amendment right to remain silent. The State questioned Lt. Bare as follows:

> Q     On February 2nd, 2010, did you have telephone contact with the defendant?
> A     Yes.
> Q     And did you ask him to do something?
> A     I asked him to come in and speak with me, to give me -- I needed additional information.
> Q     And did he do that?
> A     No.
> Q     Then what did you tell --

---

[15] W. Va. R. Evid. 701 describes when the opinion testimony of a lay witness is admissible. W. Va. R. Evid. 702 describes when the opinion testimony of an expert witness is admissible. For testimony to be admissible under 701, it must either aid in the determination of fact or the understanding of other testimony by the same witness. Under 702, testimony must aid in the determination of fact to be admissible.

39

[DEFENSE COUNSEL]: Objection, Your Honor. It's an impermissible comment on his Fifth Amendment right to remain silent.

THE COURT: Overruled.

We do not agree with Mr. Bowling's assertion that Lt. Bare impermissibly commented on Mr. Bowling's right to remain silent. At the time in question, Mr. Bowling was not in police custody. We have held, "To the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value." Syl. pt. 3, *State v. Bradshaw*, 193 W. Va. 519, 457 S.E.2d 456 (1995). *Bradshaw* is dispositive. If a person cannot invoke *Miranda* rights outside of a custodial interrogation, then commenting on a person's silence while outside of police custody is not an impermissible comment on the right to remain silent. The circuit court did not abuse its discretion with regard to this testimony.

*2. Harmless error analysis*

In our evaluation of this assignment of error, we have determined that the circuit court abused its discretion by allowing Lt. Bare to testify as to other criminal convictions and his opinion as to whether Mr. Bowling shot his wife with malice. This error is only reversible if it affected the substantial rights of Mr. Bowling. Again, we find that the error is harmless. We believe it did not prejudice the jury, and so we conclude that we cannot reverse the circuit court on this issue.

40

## IV.

## CONCLUSION

For the reasons set forth above, this Court affirms the circuit court's order entered November 10, 2011, convicting Mr. Bowling of first degree murder by use of a firearm with no recommendation of mercy.

Affirmed.